EDGAR BENAVIDEZ, ALI KAZI,
MARVIN CASTANEDA, IVAN PERALTA-
CABRERA, LUIS VICTORIA, PATRICK
DESROSIERS, ROCIO RIBEIRO,
DOUGLAS MOLINA, WILLIAM
ACAPANA, RODOLPHO OYARIDE,
FERNANDO FAJARDO, JAIME DIAZ,
ALBERTO GONZALES, KLEVER
ORDONEZ, AMIR SOTO, MARCELO
VILLACIS, ANGEL CAMPOVERDE,
JAMES LOPEZ, IVAN P. ABRIL, MARIA
JARILLO, FREDI SOTO, and NILO
HUYHUA, *on behalf of themselves and
others similarly situated*,
    *Plaintiffs*,

    v.

GREENWICH HOTEL LIMITED
PARTNERSHIP *d/b/a Hyatt Regency
Greenwich*, HYATT EQUITIES, L.L.C., and
HYATT CORPORATION,
    *Defendants*.

No. 3:16-cv-191 (VAB)

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

On March 7, 2018, Greenwich Hotel Limited Partnership, Hyatt Equities, L.L.C., and the

Hyatt Corporation (collectively, "Defendants") moved for summary judgment against Edgar

Benavidez, Ali Kazi, Marvin Castaneda, Ivan Peralta-Cabrera, Luis Victoria, Patrick Desrosiers,

Rocio Ribeiro, Douglas Molina, William Acapana, Rodolpho Oyaride, Fernando Fajardo, Jaime

Diaz, Alberto Gonzales, Klever Ordonez, Amir Soto, Marcelo Villacis, Angel Campoverde,

James Lopez, Ivan P. Abril, Maria Jarillo, Fredi Soto, and Nilo Huyhua ("Plaintiffs"). *See*

Motion for Summary Judgment, dated Mar. 7, 2018 ("Mot. Summ. J."), ECF No. 101;

Defendants' Memorandum of Law in Support of Mot. Summ. J., dated Mar. 7, 2018 ("Defs.'

Mem."), ECF No. 101-1; Defendants' Local Rule 56(a)(1) Statement of Undisputed Material Facts in Support of Mot. Summ. J., dated Mar. 7, 2018 ("Defs.' SMF"), ECF No. 101-2.

On April 25, 2018, Plaintiffs opposed Defendants' motion. *See* Plaintiffs' Memorandum in Opposition to Mot. Summ. J., dated Apr. 25, 2018 ("Pls.' Opp."), ECF No. 106-1; Plaintiffs' Local Rule 56(a)(2) Statement of Facts in Opposition to Mot. Summ. J., dated Apr. 25, 2018 ("Pls.' SMF"), ECF No. 106.

For the following reasons, Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

Defendants' motion is granted with respect to the federal claims, but denied with respect to the Connecticut law claims, which are dismissed without prejudice to refiling in state court.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations[1]

Plaintiffs have all been employed as banquet servers at the Hyatt Regency Greenwich hotel, located at 1800 East Putnam Avenue in Old Greenwich, Connecticut. First Amended Complaint, dated Sept. 19, 2016 ("Am. Compl."), ECF No. 37-3, ¶ 1. Edgar Benavidez, Ali Kazi, Marvin Castaneda, Ivan Peralta-Cabrera, Luis Victoria, Patrick Desrosiers, William Acapana, Rodolfo Oyaride, Fernando Fajardo, Jaime Diaz, Alberto Gonzales, Amir Soto, Marcelo Villacis, Angel Campoverde, James Lopez, Maria Jarillo, and Fredi Soto have all been employed by Defendants as banquet servers for at least ten years. *See* Am. Compl. ¶¶ 46–51, 54–58, 60–63, 65–66. Rocio Ribeiro, Douglas Molina, Klever Ordonez, and Nilo Huyhua have all been employed as banquet servers for at least six years. *Id.* ¶¶ 52, 53, 59, 67.

---

[1] The following facts are undisputed unless indicated otherwise.

Plaintiffs allege that Ivan P. Abril has been employed as a banquet server at the hotel for approximately eighteen years. *Id.* ¶ 64. Defendants admit that he was previously employed as a banquet server, but deny that he has been employed for eighteen years. Answer to First Amended Complaint, dated Dec. 16, 2016 ("Am. Ans."), ECF NO. 62, at 14. They do not provide an alternative estimate of the length of his employment. *Id.*

Plaintiffs all reside in either Fairfield County, Connecticut or Westchester County, New York. Am. Compl. ¶¶ 6–27.

Greenwich Hotel Limited Partnership is a limited partnership organized under the laws of Connecticut, and is the owner of the Hyatt Regency Greenwich hotel. Answer to First Amended Complaint, dated Dec. 16, 2016 ("Am. Ans."), ECF NO. 62, at 8. Hyatt Equities, L.L.C. ("Hyatt Equities") is a limited liability corporation incorporated in Delaware, and is the general partner of Greenwich Hotel Limited Partnership. *Id.* at 9. The Hyatt Corporation ("Hyatt Corp.") is a limited liability corporation incorporated in Delaware, and is the agent of Greenwich Hotel Limited Partnership. *Id.* at 9.

Plaintiffs allege that, at all relevant times, they were employees of Defendants, and were jointly employed by Defendants. Am. Compl. ¶¶ 28, 40. Defendants deny that they were joint employers, and admit only that "Plaintiffs were employees of Hyatt Corporation d/b/a Hyatt Regency Greenwich." Am. Ans. at 7.

### 1. Allegations as to Job Duties

As banquet servers, Plaintiffs have served at special events held at the Hyatt Regency Greenwich, such as conferences, weddings, and other life celebrations. Their regular duties include: "the collecting and setting up of equipment needed for the event; setting up tables; taking orders from customers; carrying trays to tables; serving food to customers; all other

general service that customers need and require; cleaning tables after events; breaking down the room after events; and all other work needed to physically set up events and clean up after them." Am. Compl. ¶ 76.

Three other categories of employees also have job functions related to these events: housemen, bartenders, and banquet captains. Am. Compl. ¶¶ 71–85.

A houseman's regular duties include "the setting up of banquet rooms; the resetting of them to their original state after the event has concluded; and during the event, assisting banquet servers and transporting tables and equipment." Am. Compl. ¶ 77.

A bartender's regular duties include "the setting up of the bar for the event; making drinks during the event, and the breaking down of the bar after the event." *Id.* ¶ 78.

The parties dispute the scope of the regular duties of a banquet captain.

Plaintiffs generally allege that banquet captains "have had, and continue to have, the power to control the banquet servers, bartenders and housemen employed within the banquet department at the Hotel, including Plaintiffs." *Id.* ¶ 71. Plaintiffs have identified four specific individuals as banquet captains in their Amended Complaint: Dan Ridell, George Mickaiel, Dennis Carrington, and Francis Tobias. *Id.* ¶ 70.

Specifically, they allege that the banquet captains are "the supervisors of the banquet events and supervise the banquet servers, bartenders and housemen[2] while these employees perform their work; i.e., the Captains are the bosses of these employees during the set-up of the banquets, the actual banquets, and breakdown of them." *Id.* ¶ 72. At pre-shift meetings, Plaintiffs

---

[2] The Amended Complaint uses the term "houseman," a singular noun, as a plural noun in multiple paragraphs. *See, e.g.*, Am. Compl. ¶ 77 ("The regular duties that houseman *are* required to perform . . . .") (emphasis added). The Court assumes these are typographical errors and has corrected them throughout, rather than indicating the alterations with brackets.

allege that "the Captains advise the banquet servers and housemen of all pertinent information concerning the upcoming events including the menu." *Id.* ¶ 73.

Plaintiffs allege that "at pre-shift meetings, as well as during the events, the Captains assign particular tables to each banquet server, and assign various duties to banquet servers including the service of hors d'oeuvres, the cleanup of the reception area, the final work needed to set up the room, the refilling of water glasses, the supplying of bread and butter to tables, and the maintenance of candles on the tables." *Id.* ¶ 74. Plaintiffs also allege that "at pre-shift meetings, as well as during the events, the Captains assign the housemen duties with respect to the setting up and refreshing of the conference and food and beverage rooms." *Id.* ¶ 75.

Plaintiffs allege that "[t]he Captains do not perform any banquet server, houseman or bartender duties; rather, they only perform supervisor duties by which they supervise those types of employees." *Id.* ¶ 79. Plaintiffs also allege that "[p]rior to and after the events, the Captains occasionally have superficial, *de minimus* contacts with the customers; however, once the event begins the Captains do not provide any service to the customers, and have typically secluded themselves within the banquet office during the term of the banquets while the banquet servers serve the customers as needed, and the housemen and bartenders perform their regular duties." *Id.* ¶ 80. Plaintiffs further allege that "Captains have had the power to discipline employees, including banquet servers, bartenders and housemen, and have in fact done so by, among other things, 'writing them up', sending employees home when they are late, ordering employees to work through lunch, and punishing them by assigning them difficult tasks and to difficult events." *Id.* ¶ 81.

Plaintiffs allege, on information and belief, that "all of the Captains participate in the evaluation of employees, including Plaintiffs, by collecting the pertinent information that is

needed to assess the performance of the employees, and Ridell collects and synthesizes all the reported information with respect to the evaluation that is eventually presented to the employee." *Id.* ¶ 82. Plaintiffs further allege that "Captains have controlled the schedules of housemen, bartenders and banquets servers, including Plaintiffs, by among other things, setting their schedules; changing their schedules including sending employees home early from events; calling them at any time, even as late as only hours before an event is to occur, to advise then that they are not needed; and requiring housemen to work as banquet servers," *id.* ¶ 83, and that "[a]t least one of the Captains has had the power to approve or deny vacation requests or requests for days off for personal reasons," *id.* ¶ 84.

Defendants deny nearly all of these allegations as to the banquet captains' duties. *See* Am. Ans. at 16–19. They admit only that "[a]t pre-shift meetings, the Captains advise the banquet servers and housemen of all pertinent information concerning the upcoming events including the menu." *Id.* at 16 (quoting Am. Compl. ¶ 73).

### 2. The Agreement with Plaintiffs' Union

The parties do not dispute that, since September 1, 2014, the terms and conditions of Plaintiffs' employment have generally been defined according to the collective bargaining agreement between Plaintiffs' union, UNITE HERE Local 217 and the Hyatt Corporation, as an agent of the Greenwich Hotel Limited Partnership, doing business as the Hyatt Regency Greenwich. Defs.' SMF ¶ 6; Pl.'s SMF ¶ 6. That agreement recognizes that UNITE HERE Local 217 is the "sole and exclusive bargaining representative with respect to wages, hours and other conditions of employment for all full-time and regular part-time employees" employed by the

Hyatt Regency Greenwich in the job classifications specified in Appendix A of the agreement.[3]
*See* Labor Agrmt. between Hyatt Corp., as an agent of Greenwich Hotel Ltd. P'ship d/b/a Hyatt Regency Greenwich, and UNITE HERE, Local 217, effective Sept. 1, 2014–Aug. 31, 2020 ("CBA"), annexed as Ex. B to Declaration of Marvin Castaneda, annexed to Pls.' Opp., ECF No. 106-4, at § 1.1.

Appendix A specifies the contract hourly rates for three "commissioned classifications": banquet servers/bartenders, banquet captains, and IRD [in-room dining] servers. CBA at App'x A. Under the contract, the base hourly pay rates for banquet servers/bartenders increase biannually as follows:

|  | 9/1/14 | 9/1/15 | 3/1/16 | 9/1/16 | 3/1/17 | 9/1/17 | 3/1/18 | 9/1/18 | 3/1/19 | 9/1/19 | 3/1/20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Banquet Server/ Bartender | 4.90 | 5.01 | 5.12 | 5.23 | 5.35 | 5.47 | 5.60 | 5.72 | 5.85 | 5.97 | 6.10 |
| Banquet Captain | 7.40 | 7.51 | 7.62 | 7.73 | 7.85 | 7.97 | 8.10 | 8.22 | 8.35 | 8.47 | 8.60 |

CBA at App'x A.

Under the CBA, events requiring banquet services shall normally be subject to a service charge of twenty-three percent of food, beverage, and room rental costs. CBA § 30.6. Those service charges are then placed into what the agreement describes as a service charge pool. *Id.* In addition, the CBA requires that fifty percent of fees charged for any carving and pasta stations, corkage fees, and extra staffing fees shall be allocated to the service charge pool. *Id.* Finally, the

---

[3] Even where a collective bargaining agreement exists, private-sector employees nevertheless may bring actions to challenge violations of their individual, nonwaivable rights to minimum wage and overtime pay under the FLSA. *See Barrentine v. Ark.-Best Freight Sys.*, 450 U.S. 728, 739–41 (1981) ("[T]he FLSA was designed to give specific minimum protections to individual workers and to ensure that each employee covered by the Act would receive '[a] fair day's pay for a fair day's work' and would be protected from "the evil of 'overwork' as well as 'underpay.' The statutory enforcement scheme grants individual employees broad access to the courts. Section 16(b) of the Act, 29 U.S.C. § 216(b), which contains the principal enforcement provisions, permits an aggrieved employee to bring his statutory wage and hour claim 'in any Federal or State court of competent jurisdiction.' This Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act . . . . [C]ongressionally granted FLSA rights take precedence over conflicting provisions in a collectively bargained compensation arrangement.").

CBA dictates that all of the tips received by banquet servers, captains, and bartenders are placed into the service charge pool. *Id.*

The CBA further provides that the service charge pool is then allocated among the workers as follows: 69% to banquet servers and banquet captains, 3% to convention services housemen and convention services supervisors, and 28% to the Hyatt Regency Greenwich as an administrative fee. *Id.*

According to the CBA, banquet captains' duties "are to facilitate the event and work with the kitchen and stewarding to ensure the function is prepared properly." *Id.* In addition, absent unusual circumstances, banquet captains are not to be scheduled for work more than two hours before an event's starting time. *Id.*

### 3. Plaintiffs' Allegations as to Defendants' Pay Practices

Plaintiffs allege that the above-described service charge pool arrangement, as well as the pool used prior to the CBA's effective date, results in two allegedly illegal pay practices.

First, Plaintiffs argue that Defendants "unlawfully required Plaintiffs to pool their tips with banquet captains who have, and continue to, manage and supervise Plaintiffs." Am. Compl. ¶ 70. Second, they allege that Defendants used that same pool to take a tip credit against the hourly minimum wage rate. Am. Compl. ¶ 87.

As a result, they contend that Defendants failed to pay Plaintiffs a minimum wage for all hours worked, in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, and specifically §§ 203(m), 206, and 215(a)(2). Plaintiffs therefore seek "their unpaid minimum wages including the amount of the tip credits that were taken by Defendants, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees[,] and costs and disbursements of the action[,] pursuant to 29 U.S.C. § 216(b)." *Id.* ¶ 93.

Plaintiffs further claim that Defendants unlawfully diverted "portions of Plaintiffs' wages, the tips/gratuities they were entitled to," in violation of Connecticut General Statute § 31-71e, and seek to recover "the tips/gratuities that [Defendants] diverted from Plaintiffs, damages for unreasonably delayed payment of those tips/gratuities, liquidated damages, reasonable attorneys' fees[,] and costs and disbursements of the action" under Connecticut General Statute § 31-72. *Id.* ¶¶ 95–96 (citing CONN. GEN. STAT. §§ 31-71e, 31-72).

Defendants dispute Plaintiffs' characterizations. They argue, rather, that the pay structure is not a "tip pool" at all, because the charges at issue are not tips, but mandatory service charges. Defs.' Mem. at 3 ("Under the FLSA, there is a clear distinction between tips, on the one hand, and commissions or service charges, on the other. A tip is voluntarily paid by a guest, while a service charge is imposed upon the guest by the hotel or restaurant."); *see also* Declaration of Tony Centrone, dated Feb. 27, 2018 ("Centrone Decl."), annexed as Ex. 1 to Defs.' SMF, ¶¶ 2–3 ("Hyatt imposes a service charge on its customers for banquet events at the Hyatt Regency Greenwich. The service charge is normally 23% of the food and beverage and room rental charges, though there are some variations. For example, some customers have negotiated a different service charge percentage, such as 21% or 22% . . . . The service charge is not optional for customers; rather, the service charge is a mandatory term of the banquet contract, agreed to in advance by Hyatt and its customers.") (citing Sample Contract, dated Feb. 17, 2016, annexed as Ex. A, ECF No. 101-4).

Defendants point to applicable federal and state guidance indicating that service charges may be used to satisfy minimum wage obligations. Defs.' Mem. at 4 ("The service charge is not optional for customers; rather, it is mandatory. The service charge is then included in the hotel's gross receipts. The distribution from service charges therefore are not tips, so they may be

counted toward minimum wage.") (citing 29 C.F.R. § 531.55(b) and CONN. DEP'T OF LABOR, *Gratuities in the Restaurant Industry*, https://www.ctdol.state.ct.us/wgwkstnd/wage-hour/restaurant.htm).

Defendants therefore argue that they have paid Plaintiffs "through a combination of hourly wages (currently $5.35 per hour) and distributions from the mandatory service charges from banquet events at which they are employed as banquet servers." Defs.' SMF ¶ 4. This results, they contend, in a "regular rate of pay for each Plaintiff in every workweek in excess of $7.25 per hour through December 9, 2017." *Id.* ¶ 5. They therefore contend that they are not only in full compliance with their obligations to pay minimum wage, but almost always exceed it. *Id.* ¶ 4. Thus, Defendants argue that "[b]ecause the undisputed evidence shows that Plaintiffs were paid at least minimum wage and that the banquet service charges they seek are not wages that are due to them," they are entitled to summary judgment on Plaintiffs' FLSA claims. Defs.' Mem. at 1–2. They further contend that Plaintiffs have no claim under Connecticut law "because they cannot show that Hyatt failed to pay them the wages that it agreed to pay them under the applicable agreement or point to any source giving rise to their entitlement to the portion of the service charges that were retained by Hyatt or paid to banquet captains." *Id.* at 2.

### B. Procedural History

On February 5, 2016, Edgar Benavidez, Ali Kazi, Marvin Castaneda, Ivan Peralta-Cabrera, Luis Victoria, Patrick Desrosiers, Rocio Ribeiro, and Douglas Molina (collectively, the "originally-named Plaintiffs") sued Defendants for failure to pay a minimum wage in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and for diversion of portions of their tips and gratuities in violation of Connecticut Wage Payment Law § 31-71e. *See* Complaint, dated Feb. 5, 2016 ("Compl."), ECF No. 1, ¶¶ 58–68.

On March 14, 2016, Defendants answered, asserting three affirmative defenses: (1) that they acted in good faith and had reasonable grounds for believing that they were in good faith compliance with the FLSA and Connecticut Wage Payment Law; (2) that Plaintiffs' claims and those of potential collective members were barred by applicable statutes; and (3) that Plaintiffs' claims and those of potential collective members were barred, in whole or in part, by statutory exclusions, exceptions, setoffs, or credits under the FLSA. Answer, dated Mar. 14, 2016, ECF No. 21, at 16. Defendants also reserved the right to assert alternative affirmative defenses. *Id.*

On May 5, 2016, the Court entered a scheduling order providing that discovery be completed by December 2, 2016. Scheduling Order, dated May 5, 2016, ECF No. 33.

On September 19, 2016, the originally-named Plaintiffs moved to amend the Complaint to join fourteen additional party Plaintiffs William Acapana, Rodolfo Oyaride, Fernando Fajardo, Jaime Diaz, Alberto Gonzales, Klever Ordonez, Amir Soto, Marcelo Villacis, Angel Campoverde, James Lopez, Ivan P. Abril, Maria Jarillo, Fredi Soto, and Nilo Huyhua. *See* Motion to Amend, dated Sept. 19, 2016, ECF No. 37; Notices, dated Sept. 19, 2016, ECF Nos. 38–51; Am. Compl. at 1.

On November 23, 2016, the Court amended the discovery schedule, extending discovery deadlines by several months. Amended Scheduling Order, dated Nov. 23, 2016, ECF No. 57.

On December 2, 2016, the Court granted the unopposed motion to amend. Order, dated Dec. 2, 2016, ECF No. 61.

On December 16, 2016, Defendants filed an amended answer, adding two additional affirmative defenses: (1) that Plaintiffs and potential class and collective members were exempt from the overtime requirements of the FLSA and Connecticut law as employees of a retail or

service establishment who are paid on a commission basis; and (2) that Plaintiffs failed to state a claim for relief against Defendants. Am. Ans.

In January 2017, Plaintiffs moved to compel Defendants to: (1) produce documents revealing all revenue realized by the Hyatt Regency Greenwich for every banquet/event held in the first quarter of 2014, 2015, and 2016; and (2) produce all documents showing how Defendants calculated the service charge and the portion distributed to service personnel at each event. Motion to Compel, dated Feb. 3, 2017, ECF No. 70.

On March 20, 2017, the Court granted in part and denied in part Plaintiffs' motion. Ruling on Motion to Compel, dated Mar. 20, 2017, ECF No. 77. The Court ordered Defendants to "produce documents demonstrating the calculation of the weekly service charge amount for the three weeks for which they have provided Banquet Service Charge distribution charts within thirty days of the date of this Order." *Id.* at 8. To further ensure that the documents produced were representative, Defendants were also ordered to "produce documents relating to the same week in 2013, 2014, and 2015." *Id.*

On March 28, 2017, Plaintiffs moved to clarify the Court's March 20, 2017 discovery ruling. Motion for Clarification, filed March 28, 2017, ECF No. 78.

On April 14, 2017, the Court granted the motion, ordering that Defendants "must produce documents relating to the same week" in 2013, 2014, and 2015. Ruling on Pls.' Motion to Clarify the Court's Discovery Order, dated Apr. 14, 2017, ECF No. 79, at 1. The Court further clarified that the documents required to be produced were "all documents that (a) reveal the revenue realized by the Hotel for each and every banquet or event held within the banquet department during these weeks, and, (b) show how the 23% service charge, and 16.56% amount distributed to service personnel, was calculated as against the revenue realized during these

weeks, including but not limited to all customer contracts, final customer invoices, EO Reports, Banquet Service Charge Distribution charts, and ledgers, spreadsheets, and other accounting records reflecting or summarizing such revenue, service charges, and tip/gratuity distribution figures." *Id.* at 2. Specifically, the Court held that "Defendants must produce weekly Banquet Service Charge Distribution charts for the three representative weeks along with the documents that the Hotel used to determine the service charge," and that these charts "must contain the service charge amount for each and every day for these weeks." *Id.*

On June 29, 2017, the Court again extended the discovery deadline to August 31, 2017. Scheduling Order, dated June 29, 2017, ECF No. 87.

On September 22, 2017, Plaintiffs moved for a discovery conference, arguing that Defendants had not produced a single ledger or accounting document itemizing the amount of revenue realized at each and every banquet held during the subject weeks. Motion for Discovery Conference, dated Sept. 22, 2017, ECF No. 88.

On October 10, 2017, the Court ordered Defendants to produce "Event Actualization System" records for the weeks responsive to the Court's April Order by November 10, 2017. Order, dated Oct. 10, 2017, ECF No. 95. The Court also granted Plaintiffs' motion to extend time to respond to Defendants' requests for admission and outstanding discovery requests by an additional thirty days. *Id.*

On March 7, 2018, Defendants moved for summary judgment against Plaintiffs. Mot. Summ. J.

On April 25, 2018, Plaintiffs opposed the motion. *See* Pls.' Opp.; Pls.' SMF.

On May 17, 2018, Defendants replied to Plaintiffs' opposition. Reply, dated May 17, 2018, ECF No. 109.

On December 12, 2018, the Court heard oral argument on the motion for summary judgment and reserved decision. Minute Entry, dated Dec. 12, 2018, ECF No. 111.

## II.  STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law.") (citing *Anderson*, 477 U.S. at 248).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed

material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *Dufort v. City of N.Y.*, 874 F.3d 338, 343 (2d Cir. 2017). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III. DISCUSSION

### A. Plaintiffs' FLSA Claims

Defendants argue that Plaintiffs' FLSA claims fail as a matter of law because when base hourly wages and distributions from the service charge pool are combined, all Plaintiffs earned an effective wage above the federal hourly minimum wage of $7.25 for all hours worked. *See* Defs.' Mem. at 3 ("Plaintiffs were paid an hourly wage per the collective bargaining agreement of at least $5.35 per hour, and each of them in each of the relevant weeks received service charges that, when combined with their hourly-based pay, exceeded the minimum wage of $7.25 per hour.").

Plaintiffs contend that summary judgment must be denied because there are material issues of fact in dispute: specifically, whether the service charge pool was, in fact, a tip pool and, if so, whether its inclusion of the banquet captains was improper under the FLSA's tip credit and tip pooling provisions.

Because Plaintiffs have only pleaded a claim for unpaid minimum wages, and because Plaintiffs have failed to show any genuine dispute as to whether they earned more than the federal minimum wage for all hours worked through base hourly wages and service charges alone, the Court agrees with Defendants.

### 1. Tips vs. Service Charges Under the FLSA

The FLSA does not explicitly define "tips" or "service charges." Department of Labor regulations have, accordingly, filled in this statutory gap.

A tip is defined as "a sum presented by a customer as a gift or gratuity in recognition of some service performed for him." 29 C.F.R. § 531.52.[4] "It is to be distinguished from payment of a charge, if any, made for the service." *Id.* "Whether a tip is to be given, and its amount, are matters determined solely by the customer, who has the right to determine who shall be the recipient of the gratuity."[5] *Id.*

---

[4] In the March 2018 tip credit amendments, Congress abrogated this regulation in part. *See* Pub. L. 115-141, 132 Stat. 348, div. S, tit. XII, § 1201(c) (2018) ("Effect on Regulations. The portions of the final rule promulgated by the Department of Labor entitled 'Updating Regulations Issued Under the Fair Labor Standards Act' (76 Fed. Reg. 18832 (April 5, 2011)) that revised sections 531.52, 531.54, and 531.59 of title 29, Code of Federal Regulations (76 Fed. Reg. 18854–18856) and that are not addressed by section 3(m) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(m)) (as such section was in effect on April 5, 2011), shall have no further force or effect until any future action taken by the Administrator of the Wage and Hour Division of the Department of Labor."). That abrogation did not, however, affect the definition of "tip" set forth in the first sentence of this regulation, which has been unchanged since first adopted. *See* 29 C.F.R. § 531.52 (effective to May 4, 2011); *see also* 76 Fed. Reg. 18832 (April 5, 2011) (revising § 531.52 from the "second sentence to the end of the paragraph").

[5] While this sentence was slightly revised by the 2011 final rule, this change in language does not appear to have had any substantive effect. *Compare* 29 C.F.R. § 531.52 (effective to May 4, 2011) ("Whether a tip is to be given, and its amount, are matters determined solely by the customer, and generally he has the right to determine who shall be the recipient of his gratuity."), *with* 29 29 C.F.R. § 531.52 (effective May 5, 2011) (Whether a tip is to be given, and

A "compulsory charge for service, such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip and, even if distributed by the employer to its employees, cannot be counted as a tip received in applying the provisions of section 3(m) and 3(t)." 29 C.F.R. § 531.55(a). "Similarly, where negotiations between a hotel and a customer for banquet facilities include amounts for distribution to employees of the hotel, the amounts so distributed are not counted as tips received." *Id.* "[S]ervice charges and other similar sums which become part of the employer's gross receipts are not tips for purposes of the Act." 29 C.F.R. § 531.55(b); *see Labriola v. Clinton Entm't Mgmt., LLC*, No. 15 C 4123, 2017 WL 1150989, at *11 (N.D. Ill. Mar. 28, 2017) ("Courts generally agree that service charges must be included in an employer's gross receipts.") (collecting cases); *see also Barenboim v. Starbucks Corp.*, 698 F.3d 104, 112 (2d Cir. 2012) (explaining that while service charges are considered gratuity under New York law and may not be retained by employers, "Tips under the FLSA, by contrast, do not include such obligatory service charges.") (citing 29 C.F.R. § 531.55(a)). "Where such sums are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the Act." 29 C.F.R. § 531.55(b); *see Lusk v. Serve U Brands, Inc.*, 2018 WL 826857, at *2 (W.D.N.Y. Feb. 12, 2018) ("Service charges that are distributed by an employer to its employees "may be used in their entirety to satisfy the monetary requirements of the [FLSA].") (quoting 29 C.F.R. § 531.55(b)); *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 929 (S.D.N.Y. 2013) ("[T]hese regulations require that service charges be distributed *by the employer* in order to count toward wages.") (citing 29 C.F.R. § 531.55(b)) (emphasis in original).

---

its amount, are matters determined solely by the customer, who has the right to determine who shall be the recipient of the gratuity.").

Thus, where a service charge is mandatory, and is included in the employer's gross receipts, it is properly deemed a service charge, and not a tip, for purposes of the FLSA. Where, however, a customer retains discretion over its payment, it is a tip. *See Soliman v. SOBE Miami, LLC*, 312 F. Supp. 3d 1344, 1351 (S.D. Fla. May 14, 2018) ("If payment of a service charge is within the customer's discretion . . . it is a 'gratuity' or 'tip.'") (citations omitted). Finally, where a service charge has been used and the proceeds of the service charge are distributed to employees, the proceeds distributed to employees are counted as wages towards satisfying the employer's minimum wage obligations. *See, e.g., Labriola*, 2017 WL 1150989, at *11 ("Service charges that are distributed from employers to employees are counted against an employer's minimum wage obligations, while tips are not; employers must still pay tipped employee a wage.") (citing 29 C.F.R. §§ 531.50, 531.55); *McFeeley v. Jackson St. Entm't, LLC*, 825 F.3d 235, 246 (4th Cir. 2016) (where service charges included in establishment's gross receipts and distributed by employer to employees, they may be counted "as an offset to an employer's minimum wage liability.").

## 2. Tip Credits and Tip Pools under the FLSA[6]

Under the FLSA, an employer of a "tipped employee"—i.e., an employee engaged in an occupation in which he or she customarily and regularly receives more than $30 a month in tips, 29 U.S.C. § 203(t)—may utilize a unique payment structure to compensate employees.[7]

---

[6] As detailed below, Congress amended the FLSA's tip credit provisions effective March 23, 2018. The bulk of the period covered by Plaintiffs' Amended Complaint was subject to the version of the statute in effect from December 16, 2014 to March 22, 2018. Where the substantive provisions referred to remain the same, the Court generally cites the statute as currently enacted unless the amendment has resulted in a renumbering or restyling of the provision, in which case the Court will cite both versions. Where the provisions have substantively changed, the Court will specify which version of the statute is being cited.

[7] *See* Benjamin Meyer, *Mrs. Orville Isn't Trying to Steal Tips: An FLSA Story*, 84 U. Chi. L. Rev. 1971, 1973–77 (2017)(summarizing how this structure came to be codified in the FLSA).

Employers may pay a tipped employee using a combination of: (1) a base hourly wage (also known as a "cash wage" or a "direct wage"), which may be as low as $2.13;[8] and (2) an additional amount on account of the tips received by the employee (commonly known as a "tip credit"[9]) that is equal to the difference between the base hourly wage and the statutory minimum wage. 29 U.S.C. § 203(m)(2) (effective Mar. 23, 2018); 29 U.S.C. § 203(m) (effective Dec. 16, 2014 to Mar. 22, 2018). The combination of the base hourly wage and the amount earned on account of tips must equal at least the statutory federal minimum wage, which has remained $7.25 per hour since July 25, 2009. 29 U.S.C. 206(a)(1)(C); *see also Trejo v. Ryman Hospitality Props.*, 795 F.3d 442, 447 (4th Cir. 2015) ("An employer can thus pay tipped employees (1) a cash wage of $2.13 plus (2) an additional amount in tips that brings the total wage to the federal minimum wage.") (citation omitted).

"[I]f the employee does not in fact receive sufficient tips to earn at least $7.25 per hour, the employer must make up the difference." *Azeez v. Ramaiah*, No. 14-cv-5623 (PAE), 2015 WL 1637871, at *4 n.5 (S.D.N.Y. Apr. 9, 2015) (citing 29 U.S.C. § 203(m)(2) (effective Dec. 16, 2014 to Mar. 22, 2018)); *see also Marlow v. New Food Guy, Inc.*, 861 F.3d 1157, 1160 (10th Cir. 2017) ("This provision gives employers of 'tipped employees'—like hotels and restaurants—the option of paying a reduced hourly wage of $2.13 so long as their workers receive enough tips to

---

[8] Specifically, the statute provides that the base hourly wage "shall be not less than the cash wage required to be paid such an employee on August 20, 1996." 29 U.S.C. 203(m)(2)(A)(i) (effective Mar. 23, 2018); 29 U.S.C. 203(m)(1) (effective Dec. 16, 2014 to Mar. 22, 2018). That amount in 1996, and today, remains $2.13. *See Chung v. New Silver Palace Rest.*, 246 F. Supp. 2d 220, 228 (S.D.N.Y. 2002) ("As of August 20, 1996, the minimum wage was $4.25 an hour, and the tip credit could be as much as one-half, or $2.13 an hour. When, effective on and after September 1, 1997, the minimum wage rose to $5.15 an hour, the minimum cash wage for tipped employees of $2.13 was retained, and the maximum tip credit rose to $3.02 an hour.") (citations omitted).

[9] *Oreg. Rest. & Lodging Ass'n v. Perez*, 816 F.3d 1080, 1082 (9th Cir. 2016) ("This practice is known as taking a 'tip credit.'"); *see also Malivuk v. Ameripark, LLC*, 694 F. App'x 705, 706–07 (11th Cir. 2017) ("An employer who utilizes an employee's hourly tips to reach the minimum hourly wage due the employee is said to take a 'tip credit.'")

bring them to the $7.25 minimum. If there are not enough tips, the employer must pay the difference; if there are more than enough, the excess tips go to employees.").

To take the tip credit toward its minimum wage obligation, the employer must (1) provide a tipped employee with notice of the provisions of 29 U.S.C. § 203(m), and (2) allow that employee to retain all tips they receive. *See* 29 U.S.C. § 203(m)(2)(A) (effective Dec. 14, 2014 to Mar. 22, 2018) ("The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee . . . ."); 29 U.S.C. § 203(m) (effective Dec. 14, 2014 to Mar. 22, 2018) (same).

These two requirements are strictly construed; that is, an employer may not take a tip credit toward its minimum wage obligation unless it complies strictly with both statutory requirements. 29 U.S.C. § 203(m)(2)(A) (effective Mar. 23, 2018); 29 U.S.C. § 203(m) (effective Dec. 14, 2014 to Mar. 22, 2018); *see Chung v. New Silver Palace Rest.*, 246 F. Supp. 2d 220, 230 (S.D.N.Y. 2002) ("Congress, in crafting the tip credit provision of section 3(m) of the FLSA did not create a middle ground allowing an employer both to take the tip credit and share employees' tips. Congress gave employers of tipped employees a simple choice: either allow employees to keep all the tips that they receive, or forgo the tip credit and pay them the full hourly minimum wage.").

The one caveat to the second requirement (allowing employees to retain all tips they receive) occurs when employers elect to use "tip pools." A tip pool allows an employer to divide tips for a given shift among all tipped employees, thereby ensuring that all tipped employees earn enough in tip credit to satisfy the minimum wage and mitigating any potential for unfairness that

may result from, for example, one tipped employee's bad luck in serving a lower-tipping customer.[10]

The FLSA makes clear that when tip pools that are limited to employees who "customarily and regularly receive tips" are utilized, the employer is not required to allow an individual employee to keep all tips he or she individually received. 29 U.S.C. § 203(m)(2)(A) (effective Mar. 23, 2018) ("The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips."); 29 U.S.C. § 203(m) (effective Dec. 16, 2014 to Mar. 22, 2018) (same). In other words, the employer may require a tipped employee to share his or her individual tips—but only with other tipped employees in a valid tip pool.

Thus, if an employer's tip pool includes non-tipped employees, the employer loses its entitlement to take a tip credit. *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 240 (2d Cir. 2011) ("[A]n employer loses its entitlement to the tip credit where it requires tipped employees to share tips with (1) employees who do not provide direct customer service or (2) managers.") (citations omitted).

### 3. Minimum Wage

Until March 23, 2018, there was "no federal cause of action for unlawful retention of tips." *Azeez*, 2015 WL 1637871, at *6. The FLSA only provided "a 'right of action' against '[a]ny employer who violates the provisions of section 206,' which establishes minimum wage obligations, 'or section 207,' which governs maximum hours and overtime compensation." *Id.*

---

[10] *See, e.g.*, Meyer, *supra* note 7, at 1972 (explaining that servers often share tips with one another "to create a team culture in the restaurant, or to minimize the risks associated with the variance in party sizes and patron generosity.").

(quoting 29 U.S.C. § 216(b)); *see Malivuk*, 694 F. App'x at 708 ("Plaintiff's tip-withholding claim implicates neither § 206 (minimum wage) nor § 207 (overtime), and thus Plaintiff cannot assert a private cause of action under § 216(b).") (citations omitted); *Widjaja v. Kang Yue USA Corp.*, No. 09-cv-2089 (RRM)(CLP), 2011 WL 4460642, at *3 n.6 (E.D.N.Y. 2011) ("Plaintiffs concede, however, that Ng does not have a federal claim because he was paid at least minimum wage and federal law only proscribes the retention of tips if the employee is paid less than minimum wage."); *Cumbie v. Woody Woo, Inc.*, 596 F.3d 577, 582–83 (9th Cir. 2010) ("Cumbie received a wage that was far greater than the federally prescribed minimum, plus a substantial portion of her tips . . . . nothing in the text of the FLSA purports to restrict employee tip-pooling arrangements when no tip credit is taken . . . ."); *see also Nakahata v. N.Y.–Presbyterian Healthcare Sys.*, 723 F.3d 192, 201 (2d Cir. 2013) ("[T] he FLSA is unavailing where wages do not fall below the statutory minimum and hours do not rise above the overtime threshold.") (citation omitted).

Instead, these tip credit and tip pooling provisions simply established how employers of tipped employees could meet their minimum wage obligations. If an employer's tip withholding practices resulted in minimum wage or overtime violations, the employee could sue to enforce the tip credit and tip pooling provisions to ensure they received the statutorily-required minimum wage and overtime. *See Trejo*, 795 F.3d at 448 ("Given that context, § 203(m) does not state freestanding *requirements* pertaining to all tipped employees, but rather creates rights and obligations for employers attempting to use tips as a credit against the minimum wage . . . . We thus find that the statutory requirements that an employer inform an employee of § 203(m) and permit the employee to retain all his tips unless the employee is in a tip pool with other regularly tipped employees does not apply to employees, like the Plaintiffs, who are seeking only the

recovery of the tips unrelated to a minimum wage or overtime claim.") (citations and internal quotation marks omitted).

If, however, that employer paid hourly wages that, before tips, were higher than the federal minimum wage, there was no federal law cause of action under the FLSA. *See Trinidad v. Pret a Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 561–62 (S.D.N.Y. 2013) ("By its terms, Section 203(m) imposes conditions on tip-pooling arrangements as a means of vindicating the FLSA's minimum wage requirement. It is not plausibly read to impose a nationwide freestanding code of conduct regarding the handling of tip money where the statute's minimum-wage command is otherwise met.").

### 4. 2018 Tip Credit Amendments

As part of an omnibus spending bill, Congress adopted several amendments to the FLSA tip credit provisions. *See* Pub. L. 115-141, 132 Stat. 348, div. S, tit. XII, § 1201 (2018). The FLSA now provides that "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit." 29 U.S.C. § 203(m)(2)(B) (effective Mar. 23, 2018).

Congress also has created what appears to be a new, separate cause of action for the recovery of unpaid, or improperly withheld, tips—regardless of whether the employer takes a tip credit. *See* 29 U.S.C. § 216(b) (effective Mar. 23, 2018) ("Any employer who violates section 203(m)(2)(B) of this title shall be liable to the employee or employees affected in the amount of the sum of any tip credit taken by the employer and all such tips unlawfully kept by the employer, and in an additional equal amount as liquidated damages. An action to recover the liability prescribed in the preceding sentences may be maintained against any employer

(including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.").

### 5. Plaintiffs' Claims

At oral argument, Plaintiffs insisted that their claims were viable under the prior version of the statute. The Court therefore confines its analysis to Plaintiffs' claims for minimum wages under the statute as enacted until March 22, 2018.

Plaintiffs argue that any base hourly wage payment made to tipped workers that is, on its face, below minimum wage is a cash wage being paid in reliance on the tip credit. *See* Pls.' SMF at 5 ¶ 1 ("Plaintiffs' hourly rate of pay is less than the minimum wage, and the remainder of the required minimum wage is achieved through an employer tip credit."). In other words: if it looks like a tip credit, it must be a tip credit.

Plaintiffs have admitted, however, that they have been subject to the terms of the CBA since September 1, 2014. Defs.' SMF ¶ 6; Pls.' SMF ¶ 6. The CBA establishes a service charge pool and sets forth a general procedure by which the hotel agrees to contract for the payment of mandatory service charges by banquet customers. *See supra* § I.A.2. It also states that any voluntary tips given by banquet customers, above and beyond its service charges, will be reserved in their entirety for distribution to banquet servers and captains. *Id.*

Plaintiffs also have admitted that the "service charge is normally 23% of the food, beverage, and room rental charges."[11] Pls.' SMF ¶ 2. Nor do they dispute that these mandatory service charges are included in the hotel's gross receipts. Defs.' SMF ¶ 2; Pls.' SMF ¶ 2.[12]

As a result, there is no factual dispute as to whether the "pool" contains service charges. As discussed above, service charges, may be used in their entirety to ensure compliance with the FLSA's minimum wage obligations. *See Wai Man Tom v. Hospitality Ventures LLC*, No. 5:17-cv-98-FL, 2018 WL 6620886, at *8 (E.D.N.C. Dec. 18, 2018) (service charges "may be used in their entirety to satisfy the monetary requirements of the FLSA); *Lusk*, 2018 WL 826857, at *2 ("Service charges that are distributed by an employer to its employees "may be used in their entirety to satisfy the monetary requirements of the [FLSA].") (quoting 29 C.F.R. § 531.55(b)); *McFeeley*, 825 F.3d at 246 (where service charges included in establishment's gross receipts and distributed by employer to employees, they may be counted "as an offset to an employer's minimum wage liability."). If, as Defendants argue, those service charges, combined with the base hourly wages, bring Plaintiffs' effective hourly wages above the federal minimum wage,

---

[11] Three sample catering contracts in the record demonstrate how this language, incorporated into the hotel's banquet contracts, is a mandatory contract term. *Compare* Catering Contract, dated Mar. 21, 2014, annexed as C to Centrone Decl., ECF No. 101-6 ("A 23% Service Charge and applicable taxes shall be added to all food and beverage."), *with* Catering Contract, dated Mar. 23, 2015, annexed as Ex. B to Centrone Decl., ECF No. 101-5 ("A 23% Service Charge and applicable taxes shall be added to all food, beverage and meeting room rental."), *and* Catering Contract, dated Feb. 17, 2016, annexed as Ex. A to Centrone Decl., ECF No. 101-4 ("A Twenty-three percent (23%) service charge and applicable taxes shall be added to all food and beverage and room rental.").

[12] While Plaintiffs state they "object to the remainder" of ¶ 2 of Defendants' Statement of Material Facts, they only describe their objection as being to whether different contracts may provide for different service charge amounts than the standard 23%. Pls.' SMF ¶ 2. They have not objected to the claim that the service charges are included in the hotel's gross receipts, nor have they provided any evidence creating a genuine issue of material fact to dispute this point. Plaintiffs try to qualify their responses on the basis of a failure of Defendants to provide necessary information in discovery, but, as discussed below, this argument fails.

then Defendants have met their federal minimum wage obligations and Plaintiffs do not have a viable minimum wage claim under the FLSA.[13]

At this stage, Plaintiffs must show that there is a genuine dispute of material fact, but have failed to show that their hourly wages and wages earned through mandatory service charges do not satisfy Defendants' minimum wage obligations. Indeed, Plaintiffs have been unable to identify a single employee or pay period in which Defendants were unable to meet their minimum wage obligations through base hourly wages and service charges.[14]

At oral argument, Plaintiffs claimed, that they were unable to do so because Defendants failed to produce critical information that should have been provided in discovery. To the extent that Plaintiffs are suggesting that, under Rule 56(d) of the Federal Rules of Civil Procedure, this motion should not be decided now, the Court disagrees. *See* FED. R. CIV. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.").

---

[13] This is unlike the situation in a very similar case involving Hyatt banquet servers, where the plaintiff received a base hourly rate of $11.24 to $11.57 throughout her employment, plus service charges. *See Livi v. Hyatt Hotels Corp.*, No. 15-cv-5371, 2017 WL 5128173, at *3 (E.D.N.Y. Nov. 6, 2017) ("Hyatt paid Livi for her work as a Banquet Server through a combination of hourly wages and distributions from the service charges that Hyatt collected on Banquet Events. From September 29, 2012, to the date of her separation, Livi's hourly rate ranged from $11.24 to $11.57 per hour. Throughout the course of Livi's employment, service charge distributions constituted more than 50% of Livi's total compensation.") (citations omitted), *aff'd*, 751 F. App'x 208 (2018).

Had Defendants paid a base hourly wage here that was at least $7.25, this would be a very straightforward case. *See, e.g., Trejo*, 795 F.3d at 446 ("Here, the Plaintiffs concede that they are paid a full minimum wage absent tips . . Here, the Plaintiffs concede that they are paid a full minimum wage absent tips.); *Woody Woo*, 596 F.3d at 582–83 ("Cumbie received a wage that was far greater than the federally prescribed minimum, plus a substantial portion of her tips. Naturally, she would prefer to receive *all* of her tips, but the FLSA does not create such an entitlement where no tip credit is taken . . . .").

[14] Notably, during the course of discovery, Defendants identified two employees who, on one occasion each, failed to receive a minimum wage for all hours worked, and quickly paid them the difference between what they were paid and what they were owed at the Connecticut minimum wage rate, plus an equal amount in liquidated damages. *See* Centrone Decl. ¶ 8. At oral argument, Defendants confirmed that those individuals indeed had been paid.

"[A] party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003) (citation and internal quotation marks omitted).

Plaintiffs do not directly invoke Rule 56(d) in their memorandum opposing summary judgment, *see* Pls.' Opp., but use its language at several points in their Statement of Material Facts and in a declaration from one of their attorneys. *See, e.g.*, Pls.' SMF ¶ 2 ("Defendants refused to produce contracts during the relevant period . . . . as such, Plaintiffs cannot present facts essential to justify its opposition."); Declaration of John J. Malley, Esq., dated Apr. 25, 2018 ("Malley Decl."), annexed to Pls.' SMF, ECF No. 106-12, ¶ 2 ("Plaintiff cannot present facts essential to justify its opposition."). This declaration appears to satisfy Rule 56(d)'s procedural requirement that the nonmovant file an affidavit or declaration. *See FTC v. Moses*, 913 F.3d 297, 306 (2d Cir. 2019) (finding nonmovant waived arguments as to insufficiency of discovery under Rule 56(d) by failing to file "an affidavit explaining why such discovery is necessary.").

Plaintiffs first argue that Defendants refused to produce all banquet service contracts for the period beginning three years before the filing of the Complaint through the present. As a result, they cannot present facts as to whether the contracts actually provided for slight variations from the standard 23% service charge. Plaintiffs fail to explain, however, how they reasonably expect such facts would create a genuine dispute of material fact, given that Defendants have already admitted that there are occasionally slight variations in the negotiated service charge.

These minor, negotiated-for variations to mandatory service charges would not transform the service charges into tips. *See* 29 C.F.R. § 531.55(a) ("Similarly, where negotiations between a hotel and a customer for banquet facilities include amounts for distribution to employees of the hotel, the amounts so distributed are not counted as tips received.").

Plaintiffs further argue that Defendants "refused to produce critical documents that are needed to determine if Defendants' calculations of the purported service charges only are accurate, most importantly, the Banquet Service Charge Distribution charts that this Court identified as essential to understanding the accuracy of Defendants' service charge calculations." Malley Decl. ¶ 6. Plaintiffs state that the "accuracy of the service charges cannot be measured, unless the banquet revenue figures are identified." *Id.* On March 20, 2017, however, the Court ordered Defendants to produce documents relating to a representative week across three years, 2013, 2014, and 2015:

> Defendants must produce documents demonstrating the calculation of the weekly service charge amount for the three weeks for which they have provided Banquet Service Charge distribution charts within thirty days of the date of this Order. To further ensure that the documents produced are representative, Defendants must produce documents relating to the same week in 2013, 2014, and 2015. If further questions arise after Defendants produce these three weeks' worth of documents, Plaintiffs can renew their motion to compel.

Ruling on Plaintiff's Motion to Compel, dated Mar. 20, 2017, ECF No. 77, at 8. Consistent with Federal Rule of Civil Procedure 26(b)(1), the Court sought to "'assess the circumstances of the case and limit discovery accordingly to ensure that the scope and duration of discovery is reasonably proportional to the value of the requested information, the needs of the case, and the parties' resources.'" *Id.* at 6 (quoting *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 562 (S.D.N.Y. 2013). The Court explicitly noted the burden of compliance with Plaintiffs' request, as

well as the fact that the documents sought did not appear "directly relevant to the determination of whether the service charge was a tip." *Id.* at 6–7. Nevertheless, the Court made clear that "[i]f further questions arise after Defendants produce these three weeks' worth of documents, Plaintiffs can renew their motion to compel." *Id.* at 8.

On April 14, 2017, in response to a motion by Plaintiffs seeking clarification as to the precise scope of the March 20, 2017 ruling, the Court ordered Defendants to produce

> all documents that (a) reveal the revenue realized by the Hotel for each and every banquet or event held within the banquet department during these weeks, and, (b) show how the 23% service charge, and 16.56% amount distributed to service personnel, was calculated as against the revenue realized during these weeks, including but not limited to all customer contracts, final customer invoices, EO Reports, Banquet Service Charge Distribution charts, and ledgers, spreadsheets, and other accounting records reflecting or summarizing such revenue, service charges, and tip/gratuity distribution figures. Specifically, Defendants must produce weekly Banquet Service Charge Distribution charts for the three representative weeks along with the documents that the Hotel used to determine the service charge. Each chart must contain the service charge amount for each and every day for these weeks. Defendants must also produce any and all documents showing how this charge was calculated, including but not limited to the documents Plaintiffs sought in their motion to compel. They must also produce any and all documents that reflect revenue realized at any banquet/event that occurred during the subject periods for which service charge amounts are not reflected on the Banquet Service Charge Distribution charts.

Ruling on Plaintiffs' Motion to Clarify the Court's Discovery Order, dated Apr. 14, 2017, ECF No. 79.

In other words, these rulings were designed to yield the very revenue documents Plaintiffs now claim they need, but limited to a representative sample proportional to the needs of the case. The rulings also explicitly invited Plaintiffs to renew its motion to compel as needed, after reviewing the Defendants' production.

On September 22, 2017, Plaintiffs moved for a discovery conference to address outstanding issues related to this document production. Motion for Discovery Conference, dated Sept. 22, 2017, ECF No. 88. After that conference, the Court ordered Defendants to "provide Event Actualization System records for the weeks responsive to the Court's April Order" by November 10, 2017. Ruling and Order on Discovery, dated Oct. 10, 2017, ECF No. 95.

No further motions related to discovery were filed, nor were any deficiencies in discovery brought to the Court's attention in the five months between that ruling and order and the filing of Defendants' summary judgment motion.

In short, Plaintiffs had an opportunity to receive the "critical documents" they now claim to need. While the Court limited discovery to a representative sample, if, after reviewing that sample, Plaintiffs arguably needed more, they had ample time to return to the Court and seek it. As the Second Circuit has noted: "A party who both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery absent a strong showing of need." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 927–28 (2d Cir. 1985). That is the case here. As a result, to the extent Plaintiffs claim that this Court should not rule on Defendants' motion or delay ruling in order to permit Plaintiffs additional discovery under Rule 56(d), the Court declines to defer consideration of this motion and re-open discovery.

In any event, Plaintiffs' argument, that the service charges can and should be treated as tips, is wrong as a matter of law, given that there is no genuine dispute that service charges were a mandatory term of the banquet contracts. It does not seem "reasonably likely" that a review of those four years of contracts would reveal that the service charges—which were required to be imposed by the CBA— were actually voluntary tips completely at the customers' discretion.

Plaintiffs therefore have not offered an adequate explanation for why obtaining documentation of revenue for all banquets held at the Hyatt Regency Greenwich for the years 2013–2018 will create a material issue of fact.

To the extent that discovery about whether tips given to Plaintiffs, in addition to revenue from mandatory service charges, were necessary to ensure that the Plaintiffs received a minimum wage, then the discovery already provided as well as Plaintiffs' own information would have been more than sufficient to make that claim. Plaintiffs should have copies of their own paystubs and W-2 records, and many payroll records were evidently produced in discovery. *See* Ex. A to Declaration of Marvin Castaneda, dated Apr. 25, 2018, annexed to Pls.' SMF, ECF No. 106-3. Significantly, the CBA provides that Defendants shall maintain comprehensive records and "shall make available to any Banquet employee, upon request, a breakdown of their individual itemized distribution of gratuities, fees, and hours worked for the past week." CBA § 30.1. Moreover, a number of "Banquet Service Charge Distribution" records have been produced through discovery. These records all appear to reflect how service charges were distributed to Plaintiffs. These could have been compared to other existing records—paystubs, W-2's, and individual itemized records for the Plaintiffs—and submitted in response to Defendants' summary judgment motion or provided to the Court before its filing, in support of an argument for additional discovery.

In the end, Plaintiffs have not produced any evidence to suggest that the service charges were actually tips—or that tips, rather than service charges, were necessary in order for Plaintiffs to make a minimum wage under the FLSA. One Plaintiff, Marvin Castaneda, submitted a declaration in opposition to summary judgment, asserting that "because the pool referred to in the CBA as the 'service charge pool' contains voluntary tips made by customers, we continue to

refer to it as what it is, a 'tip pool.'" Declaration of Marvin Castaneda, dated Apr. 25, 2018, annexed to Pls.' SMF, ECF No. 106-2, ¶ 8.

This is an unsupported legal conclusion. Plaintiffs have provided no support for the notion that service charges placed in a distribution fund alongside tips are converted into tips, particularly when the CBA itself provides that such funds are not to be allocated in the same manner. Moreover, whether employees or employers colloquially choose to call a service charge a tip is of no legal significance. *See Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1177 (7th Cir. 1987) ("We attach no weight to the fact that the collective bargaining agreement between the Ritz-Carlton and its waiters describes the waiters' income from the service charge as a "gratuity" rather than as a "commission.").

Absent any evidence to the contrary,[15] the Court concludes there is no genuine dispute of material fact as to whether Defendants were able to meet their minimum wage obligations through a combination of base hourly wages and mandatory service charges.

Accordingly, because Plaintiffs have failed to support their allegations that they were paid less than minimum wage before voluntary tips were accounted for, the Court finds no minimum wage claim here and thus, no FLSA claim as a matter of law. *See Trejo*, 795 F.3d at 448 ("[I]t is clear that [FLSA's] language – whatever its import – could give rise to a cause of action only if the employer is using tips to satisfy its minimum wage requirements. The FLSA is the 'minimum wage/maximum hour law.'") (citation omitted).

Defendants therefore are entitled to summary judgment on Plaintiffs' FLSA claims.

---

[15] For example, in one recent case, a district court denied summary judgment because the plaintiff presented an affidavit and payroll records that "suggest that the monthly membership charges and/or service charges that Escalante relies upon for its position that it did not violate the FLSA or Florida law were really discretionary customer tips which Escalante used to supplement the Plaintiff's compensation." *Virgin v. Escalante–Black Diamond Golf Club, LLC*, No. 5:13-cv-359-Oc-10PRL, 2014 WL 12591472, at *3 (M.D. Fla. Aug. 4, 2014), Here, by contrast, Plaintiffs have not shown a genuine issue of material fact as to whether the service charges are mandatory, included in the hotel's gross receipts, and distributed by the employer to Plaintiffs.

## B. Plaintiffs' Connecticut Law Claims

Having determined that Defendants are entitled to summary judgment and dismissal of all federal claims over which the Court had original jurisdiction, the Court may decline to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims. 28 U.S.C. § 1367(c)(3); *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[A] district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'") (quoting 28 U.S.C. § 1367(c)(3)).

"Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity' in deciding whether to exercise jurisdiction." *Kolari*, 455 F.3d at 122 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) and citing *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 446–47 (2d Cir. 1998). "In weighing these factors, the district court is aided by the Supreme Court's additional guidance in *Cohill* that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Id.* (quoting *Cohill*, 484 U.S. at 350 n.7). As the Second Circuit recently emphasized, however, "[w]hen § 1367(c)(3) applies, the district court must still meaningfully balance the supplemental jurisdiction factors" of judicial economy, convenience, fairness, and comity before declining to exercise supplemental jurisdiction. *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 86 (2d Cir. 2018).

Here, Defendants' arguments for summary judgment on Plaintiffs' state law claims rest heavily on interpretations of Connecticut laws concerning the payment of wages, specifically

CONN. GEN. STAT. §§ 31-71e and 31-72.[16] But neither Defendants nor Plaintiffs have fully

addressed the impact of Connecticut's minimum wage laws, which contain tip credit provisions

that delegate significant authority over tipped wages to the Connecticut Department of Labor, on

Plaintiffs' claims. *See* CONN. GEN. STAT. § 31-60(b); *Amaral Bros. v. Dep't of Labor*, 325 Conn.

72, 84 (2017) (" Following several additional amendments, the statute currently provides in

relevant part: 'The [commissioner] shall adopt such regulations . . . [that] shall recognize, as part

of the minimum fair wage, gratuities in an amount ... equal to [a] per cent of the minimum fair

wage per hour for persons, other than bartenders, who are employed in the hotel and restaurant

industry, including a hotel restaurant, who customarily and regularly receive gratuities . . . .")

(quoting CONN. GEN. STAT. § 31-60(b)(1)).

The precise interaction between these different state statutes and the payment of tip

credits or service charges to banquet servers who operate under a collective bargaining

agreement does not appear to have been addressed by any Connecticut state court. Connecticut

state courts therefore should have the first opportunity to do so. *See Kolari*, 455 F.3d at 124

("We have repeatedly held that a district court particularly abuses its discretion when it retains

jurisdiction over state-law claims raising unsettled questions of law following dismissal of all

original-jurisdiction claims.") (collecting cases); *Seabrook v. Jacobson*, 153 F.3d 70, 72 (2d Cir.

1998) ("Where a pendent state claim turns on novel or unresolved questions of state law . . .

principles of federalism and comity may dictate that these questions be left for decision by the

---

[16] The parties refer to these statutes as "Connecticut's wage payment law," or "Connecticut Wage Payment Laws." The statute in question falls under Chapter 558 of the Connecticut General Statutes. Chapter 558 does not itself provide a short title for the law, but a separate state statute requiring employers to furnish records refers to these sections, CONN. GEN. STAT. § 31-58 *et seq.*, as the "Connecticut Minimum Wage Act." CONN. GEN. STAT. § 31-13a. Research on the caselaw suggests that some courts have adopted "Connecticut Wage Payment Law" to describe § 31-71e specifically. *See* Search Results for "Connecticut Wage Payment Law" in Jurisdictions: Connecticut & 2nd Circuit, WESTLAWNEXT, https://next.westlaw.com (Mar. 10, 2018) (13 cases).

state courts. This is particularly true if the federal claim on which the state claim hangs has been dismissed.").

The Court therefore declines to exercise supplemental jurisdiction over the remaining state law claims and dismisses Count Two for want of jurisdiction, without prejudice to refiling in state court.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. Defendants' motion is granted with respect to the federal claims, but denied with respect to the Connecticut law claims, which are hereby dismissed without prejudice to refiling in state court.

The Clerk of the Court is respectfully directed to enter judgment for Defendants as to Count One only and to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 15th day of March, 2018.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE